**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL MALETICH,

    Plaintiff,

               Case No. 11-14615

v.               Hon. Gerald E. Rosen

LA-Z-BOY INCORPORATED,

    Defendant.

_____/

**OPINION AND ORDER REGARDING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     July 2, 2013    

PRESENT:  Honorable Gerald E. Rosen
       Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff Michael Maletich commenced this suit in this Court on October 20, 2011, alleging that his former employer, Defendant La-Z-Boy Incorporated, unlawfully terminated his employment on the basis of his age in violation of the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq.,* and that Defendant also violated the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.,* by discharging him in retaliation against his taking of medical leave.  This Court's subject matter jurisdiction rests upon Plaintiff's assertion of claims

arising under federal law.  *See* 28 U.S.C. §§ 1331, 1367(a).

Through the present motion filed on July 30, 2012, Defendant now seeks summary judgment in its favor on Plaintiff's federal and state-law claims.  In support of this motion, Defendant argues (i) that Plaintiff has failed to produce direct evidence of age discrimination in the decision to terminate his employment; (ii) that Plaintiff cannot establish at least one of the elements of a *prima facie* case of age discrimination; and (iii) that Plaintiff has failed to show that Defendant's stated reason for his termination is a pretext for age discrimination or retaliation in violation of the FMLA.  In response, Plaintiff challenges each of these assertions, contending (i) that statements made by Defendant's vice president of human resources, Steven Rindskopf, constitute direct evidence of age-based animus in Defendant's decision to terminate his employment; (ii) that, even in the absence of direct evidence, he has established each of the elements of a *prima facie* case of age discrimination; and (iii) that he has produced evidence that Defendant's stated reasons for his discharge are pretextual.

Defendant's motion has been fully briefed by the parties.  Having reviewed the parties' briefs in support of and opposition to Defendant's motion, the accompanying exhibits, and the record as a whole, the Court finds that the relevant facts, allegations, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on this

motion.

## II.  <u>FACTUAL BACKGROUND</u>

Defendant La-Z-Boy Incorporated is a furniture manufacturer and retailer with its headquarters in Monroe, Michigan.  Defendant hired Plaintiff Michael Maletich in 1979 as a computer operator in the company's Information Technology ("IT") department, and over the next twenty-seven years, Plaintiff held a variety of supervisory and management positions within this department.

**A.     Plaintiff Transfers to Defendant's Consumer Services Department in 2006, and Reports to a New Supervisor Beginning in April of 2010**

In 2006, Plaintiff applied and was selected for the position of consumer services manager in Defendant's Consumer Services department.  Until April of 2010, Plaintiff was supervised in this position by Kim Roussey, the director of customer service.  Ms. Roussey testified that Plaintiff received satisfactory or better annual evaluations during the four years she supervised him, and Plaintiff was given a substantial performance bonus in April of 2010.  (*See* Plaintiff's Response, Ex. 1, Roussey Dep. at 10-11, 21.)

Prior to 2010, Defendant sold its furniture products to customers through a network of dealers.  In 2010, however, the company made a transition to a business model under which its products would be sold directly to customers through company-owned stores.  This transition, in turn, had a significant impact on the Consumer Services department where Plaintiff was employed.  Most notably, this department transformed into a large call center staffed by many more customer service representatives than

3

Plaintiff managed at the time, and several additional managers were hired over time to supervise these additional employees.

In connection with this change in Defendant's business model, Ms. Roussey was transferred to a new position, and Defendant hired Nancy Camarota as its director of sales services, with the responsibility for managing Defendant's Sales/Services Systems, Consumer Services, and Warranty Services departments.  Ms. Camarota testified that she was brought in to help Defendant achieve its "overall goal" of "improv[ing] the approach and the interface that La-Z-Boy had with its customers."  (Defendant's Motion, Ex. 3, Camarota 3/23/2012 Dep. at 77.)  Thus, beginning in April of 2010, Plaintiff reported to Ms. Camarota rather than Ms. Roussey.

In July of 2010, Ms. Camarota asked Plaintiff and the other managers who reported to her to prepare a "Performance Goals & Results" form for the upcoming fiscal year.  As he had done with Ms. Roussey in the past, Plaintiff completed an initial draft of this form and sent it to Ms. Camarota for her review and comment.  After discussing this first draft with Ms. Camarota, Plaintiff revised it to conform with "what [Ms. Camarota] wanted or what I assumed that she wanted."  (Plaintiff's Response, Ex. 4, Plaintiff's Dep. at 82.)  In Ms. Camarota's view, however, this revised draft continued to incorporate goals that she had expressed concerns with and had asked Plaintiff to remove from his initial draft, and she and Plaintiff never were able to agree upon a final version of this form that each of them was willing to sign.  (*See* Defendant's Motion, Ex. 6, Camarota 6/19/2012 Dep. at 11-12, 14, 34-35.)

4

**B.     Plaintiff's July 15, 2010 Meeting with Ms. Camarota and a Human Resources Representative**

On July 15, 2010, Ms. Camarota scheduled a meeting with Plaintiff on the subject of "goals," and she asked a member of Defendant's Human Resources ("HR") department, Susan Vanisacker, to attend this meeting.  Ms. Camarota explained at her deposition that she called this meeting because she was "concerned that [Plaintiff] wasn't responding in a manner that was needed to my coaching and feedback," and she invited Ms. Vanisacker to attend in the belief that "by bringing in HR as an objective third party, that they might be able to use different words, they might be able to help [Plaintiff] see that there was change that was necessary."  (*Id.* at 37.)

At this July 15 meeting, which she "intended as a positive coaching session," Ms. Camarota recalled that she tried to "help [Plaintiff] see the specifics that need[ed] to change" and that she expressed concern about his "negativity."  (*Id.* at 47.)  In her view, however, Plaintiff responded by disagreeing with her criticisms and insisting that she "show him proof that he wasn't doing what needed to be done" and provide "names of people who said he wasn't doing his job."  (*Id.* at 48.)  Moreover, Ms. Camarota testified that when she "would offer examples" to support her points, Plaintiff "would dismiss them as . . . not true" and assert that Ms. Camarota "didn't understand."  (*Id.*; *see also* Defendant's Motion, Ex. 8, Camarota 7/15/2010 Meeting Notes at 2 (characterizing Plaintiff's conduct at the meeting as "challenging, bullying, and argumentative").)  Likewise, the HR representative, Ms. Vanisacker, testified that she recalled Plaintiff

stating at the meeting that "you're going to have to show me, you're going to have to

prove it to me, I don't understand why I'm negative," and she opined that Plaintiff was

"very angry, maybe a little bully-ish" during the course of the meeting.  (Defendant's

Motion, Ex. 7, Vanisacker Dep. at 47.)

Plaintiff's recollection of this July 15 meeting is considerably different.  He

testified:

> . . . [T]he meeting was entitled "goals," so I assumed that we were
> going to speak about the goals, but it wasn't anything like that.
> Immediately — and I can't remember who start[ed] speaking.  I don't think
> Ms. Vanisacker said much the whole meeting, frankly.  But Ms. Camarota
> said she brought me in there to tell me how much of a negative person I was
> and how I was a poor customer service manager.  And it shocked me
> because I had never been accused of such.  And I said, "Well, just give me
> some examples of what you're talking about," and she could not.  She could
> not give me one example.  If I said it once, I said it a dozen times, "please,"
> because I did not understand.  I said, "Please, just give me an example, tell
> me something that I've done, something that I said," and she could not.
> And then Ms. Camarota said something about, "Well, Mike, I'm getting all
> types of customer complaints about you on my phone."  I said, "Really?"
> And she said, "Yeah."  And I said, "I'd like to hear those."  She said,
> "Okay, I'll play them for you."  And I said, "Good."  And she walked over
> to her phone and then she stopped, she said, "No, I'm not going to do
> that[,]" which basically to me said she didn't have any.
>
> In the whole hour meeting, she and Ms. Vanisacker started chipping
> in about how negative I was.  And I was not argumentative.  I was not
> mean.  I said, "Please, just help me to understand, just give me an example,"
> and they could not.  Basically at one point . . . Ms. Vanisacker said, "Oh,
> Mike, I can hear negativity in your voice."  I don't know what that meant.

(Defendant's Motion, Ex. 1, Plaintiff's Dep. at 88-89.)  Plaintiff summarized the meeting

as "the two of them badgering me" and "60 minutes of telling me how negative I am but

yet not providing any examples."  (*Id.* at 89.)

6

In the course of this July 15 meeting, Ms. Camarota gave Plaintiff a blank "Corrective Action Plan" form and asked him to complete it.  Ms. Camarota testified that this was intended to "structure the conversation" during the meeting, and that she hoped that Plaintiff's completion of this form during their discussion would enable him to "internalize[] the feedback that he was given."  (Camarota 6/19/2012 Dep. at 46-47.)  She further stated that she provided Plaintiff with this form so that he would "recognize that this is a serious conversation," and that she did not fill out the form herself because she had "found in the past it's often more effective to fill it out as a team rather than to hand somebody something that's filled out that they may or may not agree with."  (*Id.* at 47, 65.)  Plaintiff, in contrast, testified that when he was given this blank form and instructed to fill it out, he was "totally befuddled" and "confused" and "just didn't know what to do."  (Plaintiff's Dep. at 89.)  When the meeting concluded without Plaintiff having filled out the blank "Corrective Action Plan" form, Ms. Camarota instructed Plaintiff to complete this form and schedule a meeting with her on Monday or Tuesday of the following week, July 19 or 20.  (*See* Camarota 6/19/2012 Dep. at 54, 64; Vanisacker Dep. at 57.)

In light of his confusion about the blank form and what Ms. Camarota was asking of him, Plaintiff sought the assistance of an HR employee, Billy Meyer, in completing this form.  Plaintiff testified that he spoke to Mr. Meyer on Monday, July 19 and that Mr. Meyer agreed to work with him, but that he was going on vacation and would not be available to meet with Plaintiff until the following week.  Accordingly, Plaintiff sent Ms.

7

Camarota an e-mail message on Tuesday, July 20, stating that he was currently working with Defendant's HR staff "on the Corrective Action Plan and will be meeting with them next week," and advising her that "I would expect that I'll have more information to provide later next week." (Plaintiff's Response, Ex. 11, Plaintiff's 7/20/2010 E-mail.) In Ms. Camarota's view, however, she was "very disappointed" with Plaintiff's e-mail, as he had evidently disregarded her instruction to schedule a meeting for that week and instead was "telling me, we're going to do things his way and on his time." (Camarota 6/19/2012 Dep. at 63.) Thus, shortly after Plaintiff sent his e-mail, Ms. Camarota responded that she had "reviewed this with Steve Rindskopf," Defendant's vice president of human resources, and she advised Plaintiff that she would "schedule a time for us to meet with Steve this week." (Plaintiff's Response, Ex. 11, Camarota 7/20/2010 E-mail.)

Upon receiving this e-mail from Ms. Camarota, Plaintiff promptly sent an e-mail to Mr. Meyer, asking if he would "please contact Steve R[indskopf] and let him know that you are working with me on this and request that we wait until you are available next week to meet." (Plaintiff's Response, Ex. 11, Plaintiff's 7/20/2010 E-mail.) Plaintiff emphasized to Mr. Meyer that "I really need you there" when he met with Ms. Camarota, explaining that "I am certain that without you, this meeting will end up just like the meeting with Nancy [Camarota] and Sue [Vanisacker]" or "worse." (*Id.*) In response, however, Mr. Meyer advised Plaintiff to attend the meeting scheduled by Ms. Camarota for that week:

I have to recommend at this point that you go ahead and meet with Nancy

8

[Camarota] and Steve [Rindskopf] if she has set that meeting up with Steve. I really believe that you can be successful and embrace the changes that are necessary, but like I said last night, when we talked[,] you may need to be very contrite and acknowledge that you do not understand what Nancy is asking of you and demonstrate your willingness to work with her.  One thing I have learned about Steve is that he values both longevity with the company as well as dedication to continuous improvement and willingness to embrace change and make things better.

If you go into that meeting with Nancy and Steve with those attitudes they will work with you.  If you go in defensive and/or totally wanting to keep everything like it is today or has been the past X? years or not be willing to accept responsibility it will be a tough meeting.  I will be glad to work with you, coach you and support you when I am back in the office next week, but at this point I recommend that you really do your best to understand what Nancy is expecting of you and work to develop those areas.  Accept her as your leader and try to put yourself in her shoes as having accepted a leadership position over an area and process that requires significant change in a short amount of time.

(Plaintiff's Response, Ex. 11, Meyer 7/20/2010 E-mail.)[1]

## C.    Plaintiff's July 22, 2010 Meeting with Ms. Camarota and Defendant's Vice President of Human Resources

On July 22, 2010, Plaintiff met with Ms. Camarota and Mr. Rindskopf.  Because

Plaintiff had not completed the Corrective Action Plan form as she had requested, Ms.

Camarota presented him with a form she had completed, in which she identified

Plaintiff's issues of concern as "Lack of Customer Service Leadership" and "Negative

---

[1]Mr. Meyer evidently forwarded a copy of this e-mail to Mr. Rindskopf and Ms. Vanisacker, explaining that "I just wanted you to be in the loop here," and opining that "maybe [Plaintiff] is trying to set himself up a defense of some kind in case he is terminated, but he certainly is not doing all that he can to be successful."  (Plaintiff's Response, Ex. 11, Meyer 7/20/2010 E-mail.)  Mr. Rindskopf responded by thanking Mr. Meyer for his "great note" to Plaintiff, and stating that "I plan to give [Plaintiff] the opportunity at the meeting, but he does need to accept change is happening and he needs to get on board," while Ms. Camarota "needs to ensure he understands his role."  (Plaintiff's Response, Ex. 11, Rindskopf 7/21/2010 E-mail.)

attitude in the workplace." (Defendant's Motion, Ex. 14, Corrective Action Plan.) This plan then set out a number of steps Plaintiff was to take to correct these issues, and advised him of the results expected of him and the measures that would be used to determine whether he had achieved these results. (*See id.*)

According to Ms. Camarota, Plaintiff responded to this plan by stating that he "didn't understand why . . . any changes were necessary and that he would keep doing what it was that he was doing." (Camarota 6/19/2012 Dep. at 99.) In addition, Mr. Rindskopf asked Plaintiff to sign the Corrective Action Plan form as an acknowledgment that he received it, whether or not he agreed with it, but he declined to do so at the meeting. (*See id.* at 100-01; *see also* Plaintiff's Response, Ex. 6, Rindskopf Dep. at 118-19.) Nonetheless, it was emphasized to Plaintiff at the July 22 meeting that the Corrective Action Plan reflected a final warning that could result in his termination, (*see* Camarota 6/19/2012 Dep. at 101; *see also* Rindskopf Dep. at 19), and the plan itself states that it was a "Final Warning," (Defendant's Motion, Ex. 14, Corrective Action Plan).

Again, Plaintiff offers a somewhat different account of what transpired at the July 22 meeting. He testified:

> It began with Mr. Rin[d]skopf giving me the opportunity to speak, say something. I basically said something to the effect that I was fortunate enough to be one of the people who actually knew the two founders of the La-Z-Boy, Incorporated . . . , and I've always tried to follow their high ideas and their standards of excellence . . . .
>
> I stated that I do recognize Nancy Camarota as my supervisor, and I will do whatever it takes to work with her. I'm willing to accept whatever changes were coming . . . . I'd be willing to do whatever it takes to be

10

successful and make the company successful.

(Plaintiff's Dep. at 106-07.)  According to Plaintiff, Mr. Rindskopf responded to this

statement by questioning his willingness to change:

> . . . . Mr. Rin[d]skopf said that I was part of the older regime,
> apparently because I knew the founders.  And it kind of took me back that
> he was stating that I was old, which I don't think I'm old.  But anyways he
> mentioned I was part of the old regime and that the company now belongs
> to the stockholders and that he kept saying there's this door of change, why
> can't you walk through this door of change.  He must have said it three
> times.  And I said I can walk through this door of change.  I've changed all
> the time.  I've been in IT for 27 years.  Things change in there constantly,
> especially technologies.  But he kept making the implication that I was just
> too old to change, which upset me even more.

(*Id.* at 110-11.)  When asked whether either Ms. Camarota or Mr. Rindskopf actually used

the phrase "too old to change," Plaintiff responded:

> I don't know that they used that exact phrase, but it was inferred to
> me that I was — they used the exact phrase I was part of the old regime and
> that I couldn't change.  Why don't you change, why can't you change?  To
> me that is, you know, you're too old to change.

(*Id.* at 113.)[2]

Following this discussion about Plaintiff's ability or willingness to change,

Plaintiff recalled that Ms. Camarota read through the Corrective Action Plan "point by

point," and that Mr. Rindskopf then asked him to sign this form.  (Plaintiff's Dep. at 109,

111.)  Plaintiff declined to do so, however, explaining that "these are Ms. Camarota's

---

[2]At his deposition, Mr. Rindskopf denied making any comment at the July 22 meeting
that Plaintiff was "part of the old regime," that he was incapable of changing because he was too
old, that he was old, or that Plaintiff seemed unable or unwilling to change.  (*See* Rindskopf Dep.
at 108-09.)

words, not mine," and asking for the opportunity to "read it over thoroughly and get back

to you." (*Id.* at 111.) In lieu of signing the form on the line designated for an employee's

signature, Plaintiff instead returned the form upon his return from medical leave on

August 9, 2010 (discussed below), with the following statement added to the end of the

form:

> I am signing this Corrective Action Plan as an acknowledgment that I have
> read it and because I have been advised to do so by La-Z-Boy Incorporated
> executive management.
>
> I do not believe the issues as stated to be accurate and do not feel that they
> are a true reflection of my job performance.
>
> I will continue to support my manager, my department, and La-Z-Boy
> Incorporated to the best of my ability as I have for the past 31 years.

(Defendant's Motion, Ex. 14, Corrective Action Plan at 2.) In Ms. Camarota's view, this

statement reinforced her concern that Plaintiff "felt that he could continue managing as he

had for the past 31 years," and that he was "going to continue doing what he is doing

because there's no need, in his opinion, to modify the results being delivered."

(Camarota 6/19/2012 Dep. at 104.)

**D.    Plaintiff's FMLA Leave**

      After the July 22 meeting, Plaintiff was off work the following day to attend a

family wedding, but he described this as "the worst time of my life." (Plaintiff's Dep. at

133.) The following Monday, July 26, 2010, Plaintiff did not return to work, but instead

provided a note from his doctor requesting that he be excused from work from July 26 to

August 8, with an anticipated return date of August 9, 2010. (*See* Defendant's Motion,

Ex. 15.)  On August 9, 2010, Plaintiff's physician faxed a certification to Defendant stating that Plaintiff had been treated for anxiety, and again identifying the anticipated duration of this condition as from July 26 to August 8.  (*See* Defendant's Motion, Ex. 17.) Plaintiff was approved for this two-week period of FMLA leave, and returned to work as scheduled on August 9, 2010.  While Plaintiff was on his leave, Ms. Camarota assumed his duties in addition to her own, and she estimated that she probably worked over one hundred hours a week during this period, which "[a]bsolutely" impacted her personal time.  (Camarota 6/19/2012 Dep. at 105-07.)

**E.     Plaintiff Is Terminated Within a Month After His Return from FMLA Leave**

Under the Corrective Action Plan presented to Plaintiff at his July 22, 2010 meeting with Ms. Camarota and Mr. Rindskopf, Plaintiff was directed, among other things, to "[d]ocument customer calls through a customer log" and "[d]ocument agent coaching through a coaching log," and to then participate in a "formal review of the logs with the director [Ms. Camarota] weekly."  (Defendant's Motion, Ex. 14, Corrective Action Plan.)  Although Plaintiff has produced evidence that he prepared call logs in accordance with this plan, (*see* Plaintiff's Response, Ex. 14), Ms. Camarota testified that she scheduled the weekly review meetings called for in the plan, but that Plaintiff attended only one and then "did not show up for the others," (Camarota 6/19/2012 Dep. at 97, 107-08).[3]  When Ms. Camarota inquired of Plaintiff why he was not attending these

---

[3]In his response to Defendant's motion, Plaintiff states that Ms. Camarota "never arranged or requested weekly meetings" with him, and that he "never refused any requests to meet with Camarota."  (Plaintiff's Response Br. at 12.)  Yet, Plaintiff cites no evidence in the

scheduled meetings, he responded that he was "very busy." (*Id.* at 108.)

Plaintiff and Ms. Camarota did meet on August 18, 2010, however, to discuss Plaintiff's progress in addressing the issues identified in the Corrective Action Plan. In keeping with Plaintiff's request that she communicate with him in writing, Ms. Camarota sent Plaintiff an August 20, 2010 e-mail summarizing this meeting, in which she noted that Plaintiff had taken some "positive step[s]" toward achieving the goals of the Corrective Action Plan but that "[o]verall' she "hadn't seen change." (Plaintiff's Response, Ex. 13, Camarota 8/20/2010 E-mail.) As to the specific issue of Plaintiff's negative attitude in the workplace, Ms. Camarota observed that Plaintiff had "commented [that he] continued to disagree with the statement and always would," and that he "did not see where the perception had come from." (*Id.*) Plaintiff responded to this e-mail on August 23, 2010, citing examples that Ms. Camarota claimed were lacking as to positive feedback from others on Plaintiff's customer leadership, and stating that the customer logs he had provided at Ms. Camarota's request were "more of a benefit for you than me," amounted to "basically duplicate work," and took "a considerable amount of time" that "could be better spent working on other issues." (Plaintiff's Response, Ex. 13, Plaintiff's 8/23/2010 E-mail.)

In Ms. Camarota's view, Plaintiff was not making progress in implementing the Corrective Action Plan and the relationship between the two of them "was deteriorating." (Camarota 6/19/2012 Dep. at 98.) In particular, Ms. Camarota concluded that Plaintiff

---

record in support of these assertions, and Ms. Camarota expressly testified to the contrary.

had "failed to correct the problems addressed in [the] Corrective Action Plan . . . , refused to routinely communicate directly with me (other than in writing) and refused to advocate for the changes I was implementing" in Defendant's customer services.  (Defendant's Motion, Ex. 4, Camarota Aff. at ¶ 9.)  In light of these failures, Ms. Camarota determined that "Plaintiff would not make any efforts to address the concerns identified in" the Corrective Action Plan."  (*Id.* at ¶ 12.)  Accordingly, Ms. Camarota decided, "in conjunction with" Mr. Rindskopf, (Plaintiff's Response, Ex. 15, Defendant's Interrogatory Responses at 5), to terminate Plaintiff's employment "because he failed to make the required changes, refused to accept the changes La-Z-Boy Customer Service Department was undergoing, refused to modify his actions, and [refused] to follow my directions," (Camarota Aff. at ¶ 13).

Plaintiff was informed of the decision to terminate his employment in a September 2, 2010 meeting with Ms. Camarota and Defendant's benefits manager, Mark Lohman. Plaintiff was 56 years old at the time of his discharge.  After Plaintiff's termination, Ms. Camarota temporarily assumed Plaintiff's job responsibilities, in addition to her own, until January of 2011.  Over the first few months of 2011, Plaintiff's former department was reorganized, his former position was eliminated, and his duties were divided among a number of other employees.  (*See* Camarota 3/23/2012 Dep. at 74-75, 89-90; Camarota 6/19/2012 Dep. at 110-11.)

## III.  ANALYSIS

**A.     The Standards Governing Defendant's Motion**

15

Through the present motion, Defendant seeks an award of summary judgment in its favor on Plaintiff's federal and state-law claims of age discrimination and his federal FMLA retaliation claim.  Under the pertinent Federal Rule, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006).  Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment," *Pack,* 434 F.3d at

16

814 (alteration, internal quotation marks, and citation omitted), and the nonmoving party

must "do more than show that there is some metaphysical doubt as to the material facts"

in order to withstand a properly supported summary judgment motion, *Petroleum*

*Enhancer, LLC v. Woodward,* 690 F.3d 757, 772 (6th Cir. 2012) (internal quotation

marks and citation omitted).

**B.    Plaintiff Has Failed as a Matter of Law to Show, Whether Through Direct or Circumstantial Evidence, That Defendant Discharged Him Because of His Age.**

In Counts Two and Three of his first amended complaint, Plaintiff has asserted

claims of age discrimination under Michigan's ELCRA and the federal ADEA, alleging

that Defendant terminated his employment due to his age.  The ADEA declares it

"unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment because of such individual's age."  29 U.S.C. §

623(a)(1).  Michigan's ELCRA similarly prohibits an employer from "fail[ing] or

refus[ing] to hire or recruit, discharg[ing], or otherwise discriminat[ing] against an

individual with respect to employment, compensation, or a term, condition, or privilege of

employment, because of . . . age."  Mich. Comp. Laws § 37.2202(1)(a).  In light of the

materially indistinguishable language used in the ADEA and ELCRA, both the Sixth

Circuit and this Court have held that claims of age discrimination brought under the

federal and Michigan statutes are analyzed under the same legal standards.  *See Geiger v.*

*Tower Automotive,* 579 F.3d 614, 626 (6th Cir. 2009); *Levitski v. Synova, Inc.,* No. 09-

17

12783, 2010 WL 2670921, at *11 (E.D. Mich. June 30, 2010).

A claim of age discrimination may be established through either direct or circumstantial evidence. *See Martin v. Toledo Cardiology Consultants, Inc.,* 548 F.3d 405, 410 (6th Cir. 2008). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003) (internal quotation marks and citation omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler,* 317 F.3d at 570. Whether a plaintiff proceeds through direct or circumstantial evidence, he "retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 177, 129 S. Ct. 2343, 2351 (2009); *see also Geiger,* 579 F.3d at 620.

### 1.    Plaintiff Has Failed to Produce Direct Evidence of Age-Based Animus in Defendant's Decision to Terminate His Employment.

In opposing Defendant's summary judgment motion and arguing that he should be permitted to go forward with his claims of age discrimination, Plaintiff first contends that he has produced direct evidence of age-based animus in Defendant's decision to discharge him. In particular, Plaintiff points to his deposition testimony that during his July 22, 2010 meeting with his supervisor, Nancy Camarota, and Defendant's vice president of human resources, Steve Rindskopf, Mr. Rindskopf stated that Plaintiff was

"part of the old regime" and "couldn't change." (Plaintiff's Dep. at 113.)[4] In Plaintiff's view, the pertinent case law has treated comparable statements as direct evidence of discriminatory animus. Defendant, however, contends that Mr. Rindskopf does not qualify as a decisionmaker whose purportedly age-based comments would qualify as direct evidence of age discrimination in the decision to discharge Plaintiff. Alternatively, Defendant maintains that the remarks attributed to Mr. Rindskopf are age-neutral or, at worst, too ambiguous to serve as direct evidence of age-based animus.

As Defendant correctly observes, an allegedly discriminatory statement cannot constitute direct evidence of unlawful discrimination unless it is made by a decisionmaker in connection with the challenged employment decision. *See Geiger,* 579 F.3d at 620-21; *Rowan v. Lockheed Martin Energy Systems, Inc.,* 360 F.3d 544, 550 (6th Cir. 2004). Defendant suggests that Mr. Rindskopf was not a decisionmaker with respect to the decision to terminate Plaintiff's employment, and that this determination instead was made by Ms. Camarota alone. (*See* Defendant's Motion, Br. in Support at 11.) Yet, in support of this assertion, Defendant cites only to (i) the deposition testimony of Ms. Camarota and Mr. Rindskopf confirming that Ms. Camarota had the authority to discharge members of the Customer Service department, such as Plaintiff (*see* Camarota

---

[4]As noted earlier, Mr. Rindskopf has denied making any such statements at the July 22 meeting, but Plaintiff's testimony on this point must be taken as true for purposes of resolving Defendant's summary judgment motion.

19

6/19/2012 Dep. at 106; Rindskopf Dep. at 63);[5] and (ii) the deposition testimony of Susan Vanisacker that she lacked "specific[]" knowledge as to who made the decision to terminate Plaintiff, but that she "assum[ed]" this decision was made by Ms. Camarota, (Vanisacker Dep. at 16).  Plainly, this evidence falls short of establishing that Mr. Rindskopf did not participate in the decision to discharge Plaintiff.

To the contrary, Plaintiff points to a discovery response in which Defendant expressly acknowledged that "[t]he decision to discharge Plaintiff was made by Nancy Camarota . . . *in conjunction with* Steven Rindskopf."  (Plaintiff's Response, Ex. 15, Defendant's Answer to Plaintiff's Interrogatory No. 3 (emphasis added).)  Although Defendant insists, without citation to the record, that Mr. Rindskopf "did not play a *meaningful* role in the decision to terminate Plaintiff's employment," (Defendant's Reply Br. at 3 (emphasis in original)), it has made no effort to reconcile its seemingly conflicting statements in its summary judgment briefing and discovery response, nor to explain how Ms. Camarota's action "in conjunction with" Mr. Rindskopf necessarily demonstrates that the latter played a less than "meaningful" role in the challenged discharge decision.  Under this record, then, the Court cannot conclude as a matter of law that Mr. Rindskopf's alleged remarks at the July 22, 2010 meeting with Plaintiff should

---

[5]Although Defendant cites this passage from Ms. Camarota's deposition as evidencing her "sole" authority to terminate members of her department, (*see* Defendant's Motion, Br. in Support at 11), Ms. Camarota made no such claim in her testimony that she alone could discharge members of the Customer Service department.  Nor was Mr. Rindskopf asked at his deposition whether Ms. Camarota possessed such "sole" authority over Customer Service department employees.

be discounted as the statements of a non-decisionmaker.

Nonetheless, the Court agrees with Defendant that these remarks, on their face, do not necessarily evidence Mr. Rindskopf's age-based animus, but instead would require one or more inferences in order to conclude that Mr. Rindskopf was predisposed to discriminate against older employees.  According to Plaintiff, Mr. Rindskopf stated at the July 22 meeting that Plaintiff was "part of the old regime," but that the "company now belongs to the stockholders and . . . there's this door of change, why can't you walk through this door of change."  (Plaintiff's Dep. at 110.)  In Plaintiff's view, these remarks raised the "implication that I was just too old to change."  (*Id.* at 110-11.)  Yet, when he was asked whether Mr. Rindskopf or Ms. Camarota actually used the phrase "too old to change," Plaintiff acknowledged that he did not "know that they used that exact phrase," and that he instead recalled them stating that "I was part of the old regime and that I couldn't change."  (*Id.* at 113.)  In light of this questioning about "why don't you change, why can't you change," Plaintiff "inferred" that Mr. Rindskopf was suggesting that he was "too old to change."  (*Id.*)

As Defendant observes, Mr. Rindskopf's remarks as recounted by Plaintiff qualify as direct evidence of age discrimination only if they would not "require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003).  Thus, the Sixth Circuit has recognized that ambiguous and arguably innocuous comments "are insufficient to support a finding

21

of direct discrimination," *White v. Columbus Metropolitan Housing Authority,* 429 F.3d 232, 239 (6th Cir. 2005); *see also Phelps v. Yale Security, Inc.* 986 F.2d 1020, 1025-26 (6th Cir. 1993), because the trier of fact would have to draw the inference that the ambiguous statement has the meaning that the plaintiff would attribute to it.

Mr. Rindskopf's purported statements that Plaintiff was "part of the old regime" and unwilling or unable to change are precisely the sort of ambiguous and arguably age-neutral comments that the Sixth Circuit has been unwilling to treat as direct evidence of discriminatory animus. As Defendant points out, these statements could readily be construed as indicative of Mr. Rindskopf's view that Plaintiff was overly wedded to Defendant's former business model and reluctant to embrace the company's change to a new way of doing business. Because this is a plausible, age-neutral interpretation of Mr. Rindskopf's comments that could equally well be said about any long-term employee, regardless of his or her age, the trier of fact would have to reject this understanding of these statements and instead infer that Mr. Rindskopf meant to refer to Plaintiff's age as rendering him incapable of change. *See Rowan,* 360 F.3d at 548-49 (observing that age and years of service "are analytically distinct," so that a "decision based on years of service is not necessarily age-based" (internal quotation marks and citation omitted); *Scott v. Potter,* No. 05-3991, 182 F. App'x 521, 526 (6th Cir. May 31, 2006) (likewise noting that "'years of service' is conceptually distinct from 'age'"). Indeed, Plaintiff himself conceded that he could not say that Mr. Rindskopf used the precise phrase that he was "too old to change," and that he instead "inferred" that this was the "implication"

22

behind Mr. Rindskopf's remarks.  (Plaintiff's Dep. at 110-11, 113.)  This concession illustrates the need to draw inferences in order to construe Mr. Rindskopf's comments as reflecting age-based animus, and Plaintiff's "subjective belief" that this is what Mr. Rindskopf meant by his ambiguous and arguably age-neutral remarks does not suffice to transform these statements into direct evidence of a predisposition to discriminate against Plaintiff on the basis of his age.  *Hein v. All America Plywood Co.,* 232 F.3d 482, 488-89 (6th Cir. 2000).

The cases cited by Plaintiff are not to the contrary.  First, in *Wexler,* 317 F.3d at 570, at the meeting in which the plaintiff was demoted from his management position, the president of the defendant corporation noted that the plaintiff was sixty years old and opined that the plaintiff did not "need the aggravation [and] stress" attendant to his managerial duties.  In addition, the company's executive vice president had previously referred to the plaintiff as "a bearded, grumpy old man," "pops," and "old man."  *Wexler,* 317 F.3d at 570-71.  The present case lacks any comparable evidence of explicit reference to Plaintiff's age as an explanation for an adverse employment action.  Similarly, in *Moradian v. SEMCO Energy Gas Co.,* 315 F. Supp.2d 870, 873, 876 (E.D. Mich. 2004), the individual who was responsible for the plaintiff's termination "consistently referred to plaintiff and himself as 'old farts' who should retire," and these remarks allegedly were made "both before and immediately after the [reduction in force] in which plaintiff's position was eliminated."  Again, Mr. Rindskopf's comment in this case that Plaintiff was "part of the old regime" lacks any such explicit reference to Plaintiff's age, nor did it

23

purport to explain Plaintiff's discharge — a decision which, after all, was not made until several weeks after the July 22, 2010 meeting at which Mr. Rindskopf made his remarks. Accordingly, the cases cited by Plaintiff are unavailing to his effort to identify direct evidence of age-based animus in the decision to terminate his employment.

### 2.     Plaintiff Has Failed to Establish a *Prima Facie* Case of Age Discrimination, and Also Has Failed as a Matter of Law to Produce Evidence That Defendant's Legitimate, Non-Discriminatory Reasons for His Discharge Were a Pretext for Discrimination.

In the absence of direct evidence of discrimination, Plaintiff's claims of age discrimination must be analyzed under the familiar tripartite standard articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  *See Geiger,* 579 F.3d at 622.  Under this *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of discrimination by showing that "he was (1) a member of protected class, (2) subject to an adverse employment action, (3) qualified for the position from which he was rejected or terminated, and (4) either replaced by a person from outside the protected class or treated differently than a similarly-situated employee from outside the protected class."  *Hein,* 232 F.3d at 489.  In its motion, Defendant does not challenge Plaintiff's showing as to the first three elements of this *prima facie* case, so only the fourth and final element remains at issue.

First, Defendant argues that the evidence fails to show that Plaintiff was "replaced" as that term has been defined in the case law.  For the first four months after Plaintiff's discharge, Ms. Camarota assumed his duties in addition to her own.  (*See*

24

Camarota 3/23/2012 Dep. at 76; Camarota 6/19/2012 Dep. at 110.)  Then, over the first

few months of 2011, Plaintiff's former department was reorganized and expanded, with

five individuals handling management duties similar to those performed by Plaintiff and

with additional employees under their supervision.  (*See* Camarota 3/23/2012 Dep. at 89-

90; Camarota 6/19/2012 Dep. at 110-11.)[6]  As Defendants correctly observe, this does not

qualify as "replacement" of Plaintiff under the law of this Circuit.  *See, e.g., Campbell v.*

*PMI Food Equipment Group, Inc.,* 509 F.3d 776, 785-86 (6th Cir. 2007); *Lilley v. BTM*

*Corp.,* 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated

employee among the remaining employees does not constitute replacement."); *Barnes v.*

*GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when

another employee is assigned to perform the plaintiff's duties in addition to other duties,

or when the work is redistributed among other existing employees already performing

related work."); *Webb v. ServiceMaster BSC LLC,* No. 10-6520, 438 F. App'x 451, 454

(6th Cir. Sept. 14, 2011) (finding that the plaintiff was not "replaced" when his former

workgroup was "restructured" and his "former responsibilities were distributed among

existing employees").  Plaintiff makes no effort to distinguish (or even address) this case

law in his response to Defendant's motion, but instead simply insists that he was

"replaced," at least for a "period of time," by Ms. Camarota, who was six years younger

---

[6]The record does not reveal how Defendant obtained the five managers who performed duties similar to those handled by Plaintiff prior to his discharge — *e.g.,* whether these individuals were new hires, promoted, or reassigned from other management positions — and neither side addresses this question in its summary judgment briefing.  Nor do the parties provide any information as to the ages of these five managers.

25

than him. (Plaintiff's Response Br. at 17.)  The above-cited case law makes clear,

however, that Ms. Camarota did not replace Plaintiff by performing his duties in addition

to her own.[7]

Nonetheless, Plaintiff also may establish the fourth and final prong of his *prima*

*facie* case by showing that he was "treated differently from similarly situated employees

outside the protected class," *Martin*, 548 F.3d at 410 (internal quotation marks and

citation omitted), and Plaintiff seeks to proceed primarily through this route.  First,

Plaintiff states (without citation to the record) that he was the oldest of the managers who

reported to Ms. Camarota, and that he was the only one of these managers to be placed on

a Corrective Action Plan that was deemed under its terms to be a "Final Warning."  Yet,

while Plaintiff and his fellow managers certainly were similarly situated in some respects

— *e.g.,* they reported to the same supervisor, Ms. Camarota, and presumably performed

the same or comparable duties and were held to the same or similar standards, *see*

*Johnson,* 319 F.3d at 867 — Plaintiff has made no effort to identify any evidence in the

record that any of these fellow managers engaged in conduct similar to that which Ms.

Camarota cited as the basis for putting Plaintiff on a Corrective Action Plan.  In

particular, Ms. Camarota testified that she presented Plaintiff with this plan in response to

---

[7]In any event, even if Ms. Camarota could be viewed as having "replaced" Plaintiff, Defendant points out that the six-year difference in their ages cannot assist Plaintiff in establishing the fourth prong of his *prima facie* case.  In particular, the Sixth Circuit has held that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.,* 349 F.3d 332, 340 (6th Cir. 2003).

what she perceived as Plaintiff's negative attitude in the workplace, and because of his apparent resistance to changes she proposed, his challenges to criticisms she raised in the course of their July 15, 2010 meeting, and his failure (at least in Ms. Camarota's view) to make sufficient efforts toward completing the blank Corrective Action Form given to him at the July 15 meeting.  In the absence of evidence that any of Plaintiff's fellow managers exhibited deficiencies of this sort in the performance of their duties, Plaintiff cannot show that he was treated differently from similarly situated but younger employees who engaged in the same or similar conduct.  *See Johnson,* 319 F.3d at 867; *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998).

Plaintiff next seeks to establish differential treatment by virtue of the fact that he was terminated within just a few weeks after he was placed on a Corrective Action Plan. In Plaintiff's view, this contravened a company practice, as testified to by Defendant's vice president of human resources, Steve Rindskopf, that such plans are "typically in effect for up to 12 months."  (Rindskopf Dep. at 43.)  Mr. Rindskopf further testified, however, that this typical 12-month term was merely a "guideline," that the appropriate time frame for a plan "[d]epends on the Corrective Action," and that "sometimes they're shorter and sometimes they could be longer."  (*Id.* at 44.)  Accordingly, this testimony by Mr. Rindskopf, standing alone and addressing only an abstract and general "guideline" rather than specific instances of employees placed on Corrective Action Plans, does not establish that Plaintiff was treated differently from similarly situated but younger employees by virtue of the relatively short term of his Corrective Action Plan.

27

In apparent recognition of this, Plaintiff points to evidence of a particular manager employed by Defendant who was permitted to remain on a Corrective Action Plan for a longer period. Specifically, Mr. Rindskopf testified about a market sales manager in her early-to-mid-forties who is employed at Defendant's distribution center in Baltimore, Maryland, and who had been working under a Corrective Action Plan for six months with the expectation that this plan might remain in effect for up to another six months. (*See* Rindskopf Dep. at 39-43.) Once again, however, Plaintiff has not attempted to marshal any evidence indicating that he and this other individual are "similarly situated" within the meaning of the governing Sixth Circuit precedents, considering such factors as "the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Johnson,* 319 F.3d at 867; *see also Ercegovich,* 154 F.3d at 352. Instead, Plaintiff and this Baltimore manager worked in different departments and reported to different supervisors, and the record is largely silent as to such pertinent considerations as (i) the standards to which this Baltimore manager was subject, (ii) the specific conduct that led her to be placed on a Corrective Action Plan, and (iii) the particular steps that she had taken to comply with the plan during the six months that she was subject to its terms. Under this record, the Court finds that Plaintiff has failed to show that he was treated differently from similarly situated but younger employees, as necessary to establish the fourth prong of a *prima facie* case of age discrimination.

Alternatively, even assuming, for present purposes, that Plaintiff has established each of the elements of a *prima facie* case, Defendant then must "articulate a legitimate,

nondiscriminatory reason for its employment action." *Martin,* 548 F.3d at 410. Defendant has identified a number of such reasons for Plaintiff's discharge, citing the issues set forth in Plaintiff's Corrective Action Plan — *i.e.,* leadership deficiencies and a negative attitude in the workplace, (*see* Defendant's Motion, Ex. 14, Corrective Action Plan) — as well as the determination of Plaintiff's supervisor, Ms. Camarota, that he was making insufficient efforts to address the concerns outlined in the plan, was resistant to the changes being made in Defendant's Customer Service Department, and was refusing to support Ms. Camarota as his supervisor and to comply with her instructions, (*see* Defendant's Motion, Ex. 4, Camarota Aff. at ¶¶ 9-13).

Accordingly, Defendant having identified a legitimate, nondiscriminatory basis for its decision to terminate Plaintiff's employment, Plaintiff "bears the burden of rebutting this proffered reason by proving that it was a pretext designed to mask age discrimination." *Wexler,* 317 F.3d at 574. Plaintiff may satisfy this burden by "showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler,* 317 F.3d at 576 (internal quotation marks and citation omitted).

In his response to Defendant's motion, Plaintiff suggests that he can establish pretext through each of these routes. First, he argues that the purported deficiencies in his performance as set forth in the Corrective Action Plan — *i.e.,* his lack of customer service leadership and negative attitude in the workplace — have no basis in fact. In support of this contention, Plaintiff points to the absence of any prior reprimands or warnings issued

to him in the thirty-year history of his employment with Defendant prior to April of 2010, when Ms. Camarota became his supervisor.  In addition, Plaintiff cites the deposition testimony of several co-workers who did not perceive him as having a negative attitude in the workplace.

Yet, as the Sixth Circuit has recognized, an employee's disagreement with his employer's "assessment of his performance . . . does not render [the employer's] reasons pretextual."  *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990); *see also Lefevers v. GAF Fiberglass Corp.,* 667 F.3d 721, 725-26 (6th Cir. 2012).  Nor can Plaintiff "raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors."  *McDonald,* 898 F.2d at 1160 (internal quotation marks and citation omitted); *see also Smith v. Leggett Wire Co.,* 220 F.3d 752, 763 (6th Cir. 2000) (explaining that "it is inappropriate for the judiciary to substitute its judgment for that of management").  Thus, in *Murphy v. Centerior Energy Corp.,* No. 93-4281, 1994 WL 573914, at *5-*6 (6th Cir. Oct. 17, 1994), the plaintiff employee (like Plaintiff here) sought to question his employer's assessment of his job performance in light of the good performance appraisals he had received in the past, the "lack of disciplinary action against him," and the "affidavits of subordinates who stated he did a good job," but the court held that this evidence failed to "create[] a genuine issue of material fact" as to the defendant employer's judgment that the plaintiff's termination was justified by his poor performance.  In so ruling, the court explained that the plaintiff's past appraisals "merely show[ed] plaintiff was a satisfactory employee" during the period

30

covered by these appraisals, and not that his current performance "met [his employer's] legitimate expectations." *Murphy,* 1994 WL 573914, at *5. Similarly, the court deemed the views of the plaintiff's subordinates as "irrelevant because plaintiff's qualifications and performance are not judged from the perspective of plaintiff's subordinates but are based on defendant's legitimate expectations." 1994 WL 573914, at *5. More generally, the court observed that "an employer may make a subjective judgment to discharge an employee for any nondiscriminatory reason, especially when a management level job is involved." 1994 WL 573914, at *6 (citing *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66, 70 (6th Cir. 1982)); *see also Browning v. Department of Army,* 436 F.3d 692, 698 (6th Cir. 2006) (noting that "this court [has] afforded great flexibility to employers when selecting management personnel").

Likewise, in this case, while there is no doubt that the performance issues cited in Plaintiff's Corrective Action Plan — *i.e.,* lack of customer service leadership and negative attitude in the workplace — were subjective in nature, Plaintiff cannot raise an issue of fact as to the accuracy of Ms. Camarota's assessment of his performance merely by pointing to past supervisors who were content with his work or the opinions of his co-workers who might not have shared Ms. Camarota's view of his workplace attitude. Ms. Camarota was not bound to accept the evaluations of Plaintiff's co-workers and former supervisors, but was entitled to establish her own criteria for measuring the performance of the individuals who reported to her. More to the point, even if the Court were inclined — contrary to Sixth Circuit precedent, *see Smith,* 220 F.3d at 763; *Ackerman,* 670 F.2d at

31

70 — to question the soundness of the factors used by Ms. Camarota to judge Plaintiff's job performance, this still would not assist Plaintiff in showing that the performance issues cited by Ms. Camarota were a pretext for age discrimination in the decision to discharge him.  *See Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 269-70 (6th Cir. 2010).  Plaintiff has produced no evidence that, for example, a younger worker who reported to Ms. Camarota was evaluated under different criteria, or was treated more favorably than Plaintiff despite similar issues with his or her job performance.  In any event, even if the Court were to discount the performance issues cited in Plaintiff's Corrective Action Plan as grounds for his discharge, this would not undermine the additional reasons given by Defendant for this decision — most notably, that Plaintiff refused to support Ms. Camarota as his supervisor and failed to comply with her instructions or accept and work toward the goals she identified in Plaintiff's Corrective Action Plan.

Plaintiff, however, challenges the factual basis for this additional proffered reason for his discharge by insisting that there is "no evidence" that he failed to follow Ms. Camarota's directives.  (Plaintiff's Response Br. at 18.)  Yet, this assertion is belied by the evidence that Plaintiff failed to comply with Ms. Camarota's request that he complete and return the blank Corrective Action Plan form given to him at July 15, 2010 meeting, leaving Ms. Camarota to prepare this form on her own.  Although Plaintiff testified that he was attempting to work on this form with the assistance of Defendant's HR staff and merely did not have the time or opportunity to meet with his preferred HR advisor, Billy

Meyer, prior to the July 22, 2010 meeting at which Ms. Camarota presented him with her version of the form, this testimony does not overcome the brute fact that Ms. Camarota directed Plaintiff to complete the form before the July 22 meeting but he failed to do so. In addition, Plaintiff's claim of "no evidence" runs afoul of Ms. Camarota's testimony that Plaintiff attended only one of the weekly meetings called for in the Corrective Action Plan, and that he more generally, in Ms. Camarota's judgment, was failing to make sufficient progress on the issues identified in the plan.  Indeed, there was ample reason for Ms. Camarota to question Plaintiff's commitment to take the corrective steps outlined in the plan, given Plaintiff's written statement in response to this plan that he "d[id] not believe the issues as stated [in the plan] to be accurate and d[id] not feel that they are a true reflection of my job performance."  (Defendant's Motion, Ex. 15, Corrective Action Plan at 2.)  Thus, Plaintiff cannot show that Defendant acted without a basis in fact in concluding that Plaintiff was subject to discharge for disregarding the directions of his supervisor.

Plaintiff next seeks to show pretext by questioning whether the reasons identified by Defendant for his discharge actually motivated this decision.  In particular, Plaintiff suggests that Defendant has offered "[s]hifting justifications" for the decision to terminate his employment, (Plaintiff's Response Br. at 19), and he observes that such changing rationales "can be evidence of pretext," *Schoonmaker,* 595 F.3d at 269.  In support of this contention, however, Plaintiff cites only Ms. Camarota's testimony that at the September 2, 2010 meeting at which Plaintiff was informed of his discharge, she advised Plaintiff

33

that she and the company were "moving in a different direction." (Camarota 6/19/2012 Dep. at 6.) Plaintiff fails to address Ms. Camarota's further testimony that she made only a "brief statement" at the September 2 meeting and then left the room, and that she viewed her "different direction" remark to Plaintiff as "synonymous" with her desire to take Defendant's Customer Service department in a new direction. (*Id.* at 7-8.) Against this backdrop, the Court views Defendant's proffered reasons for Plaintiff's discharge — including Ms. Camarota's statement in her affidavit that Plaintiff was "refus[ing] to accept the changes [Defendant's] Customer Service Department was undergoing," (Camarota Aff. at ¶ 13) — as merely a further elaboration on the "brief statement" made by Ms. Camarota to Plaintiff at the time of this decision, and not as an inconsistent, shifting justification that could support a finding of pretext.

Finally, Plaintiff points to evidence which, in his view, shows that Defendant's stated reasons for his discharge were insufficient to warrant this decision. First, Plaintiff contends that the record would support the conclusion that the decision to terminate his employment was a "foregone conclusion," without regard to whether he made sufficient efforts to implement the Corrective Action Plan, where Defendant's vice president of human resources, Mr. Rindskopf, purportedly testified that he did not "follow through to see if Plaintiff had implemented any of the suggestions under the Plan," and where "other employees on Corrective Action Plans were given at least six months, and sometimes over an entire year, to improve their performance before any adverse actions were taken." (Plaintiff's Response Br. at 19.) Yet, Plaintiff's contention as to Mr. Rindskopf's alleged

34

lack of follow-up ignores his testimony that he did, in fact, have "some discussions" with Ms. Camarota as to whether Plaintiff was complying with his Corrective Action Plan. (Rindskopf Dep. at 83-84.)  While Mr. Rindskopf acknowledged that he did not communicate directly with Plaintiff regarding his compliance with the plan or confirm whether Plaintiff had undertaken the specific measures called for in the plan, Plaintiff does not endeavor to explain why it would have been inappropriate for Mr. Rindskopf to leave such communications and monitoring up to Plaintiff's direct supervisor, Ms. Camarota, and to defer to her judgment as to whether Plaintiff was making sufficient progress toward the goals set forth in the plan.  As for Plaintiff's claim that he was given less time than other employees to implement his Corrective Action Plan, the Court addressed this contention earlier, explaining that Plaintiff has failed to produce evidence that he was treated differently from any similarly situated but younger employee with respect to the opportunity he was given to comply with his plan.[8]

In the end, Plaintiff's claim of pretext rests almost exclusively on the notion that it is implausible that an employee with a history of good evaluations and the absence of any

---

[8]Plaintiff also suggests that the pretextual nature of Defendant's decision to discharge him can be inferred from Defendant's failure to give Plaintiff the option of transferring to one of the company's newly created customer service positions, rather than terminating his employment.  Yet, assuming Defendant had a lawful basis to discharge Plaintiff, the Court is aware of no authority (and neither has Plaintiff identified any) that would impose upon Defendant the duty to consider Plaintiff for another position at the company.  Nor does the Court see how any inference of discrimination could properly arise from an employer's decision not to retain and reassign an employee who has been deemed subject to discharge by virtue of his performance in his current position.  Finally, Plaintiff testified at his deposition that at the time of his discharge, he did not ask to be considered for any open positions.  (*See* Plaintiff's Dep. at 156.)

prior disciplinary record could suffer such a rapid fall-off in job performance that his employer would be justified in placing him on a Corrective Action Plan as a "final warning" and then discharging him just a few weeks after issuing the plan.  To be sure, the record in this case evidences a contentious and non-productive relationship between Plaintiff and his supervisor, Ms. Camarota, with the two failing to see eye-to-eye as to the duties Plaintiff was to perform in Defendant's reorganized Customer Service department and the standards by which Plaintiff's job performance would be judged.  As the Sixth Circuit has explained, however, "[p]ersonality conflicts alone cannot supply the basis for an ADEA claim."  *Ackerman,* 670 F.2d at 70; *see also Nizami v. Pfizer Inc.,* 107 F. Supp.2d 791, 805 n.15 (E.D. Mich. 2000) (observing that "even such a subjective consideration as personal dislike can be a 'proper' — that is, not unlawful — basis for avoiding liability under antidiscrimination law, so long as this personal animus is not the product of the plaintiff's membership in a protected class").  Rather, to withstand Defendant's summary judgment motion, Plaintiff "must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful age-discrimination, not that other reasonable decision-makers might have retained" him.  *Rowan,* 360 F.3d at 550.  Much as Plaintiff might take issue with Ms. Camarota's conduct as his supervisor and her assessment of his job performance, the record in this case simply fails to give rise to any basis for inferring that Plaintiff's age was the but-for cause of Ms. Camarota's actions — and, in particular, her decision to terminate Plaintiff's employment.  Accordingly, the Court finds that Plaintiff has failed as

36

a matter of law to make the requisite showing that the reasons given by Defendant for his

discharge were a pretext for age discrimination.

**C.     The Record Fails as a Matter of Law to Support Plaintiff's Claim of FMLA Retaliation.**

Count One of Plaintiff's first amended complaint asserts a claim arising under the

federal FMLA.  The Sixth Circuit "has recognized two discrete theories of recovery under

the FMLA:  (1) the so-called 'interference' or 'entitlement' theory arising from [29

U.S.C.] § 2615(a)(1), and (2) the 'retaliation' or ''discrimination' theory arising from §

2615(a)(2)."  *Seeger v. Cincinnati Bell Telephone Co.,* 681 F.3d 274, 282 (6th Cir. 2012).

Although Plaintiff's complaint references both of these theories, he has acknowledged in

his response to Defendant's motion that he is pursuing only the latter theory of recovery,

alleging that Defendant terminated his employment in retaliation against his exercise of

his FMLA-protected right to take medical leave.  In the absence of direct evidence of a

retaliatory motive for this discharge — which Plaintiff does not claim to have produced

here — Plaintiff's FMLA-based claim of retaliation, like his age discrimination claim, is

"evaluated under the familiar *McDonnell Douglas* burden-shifting framework."  *Seeger,*

681 F.3d at 283.

For purposes of its motion, Defendant does not contest Plaintiff's ability to

establish a *prima facie* case of retaliation.  Likewise, Plaintiff does not deny that

Defendant has identified legitimate, non-retaliatory grounds for terminating his

employment.  Thus, the Court may proceed directly to the third stage of the *McDonnell*

*Douglas* analysis, under which Plaintiff must "adduce[] evidence which would enable a factfinder to conclude that [Defendant's] stated reason for terminating h[im] is not the true reason and is simply a pretext for unlawful retaliation." *Bryson v. Regis Corp.,* 498 F.3d 561, 572 (6th Cir. 2007).

The arguments advanced and evidence cited by Plaintiff in support of this requisite showing of pretext largely track his effort to show pretext with respect to his claim of age discrimination, and the Court therefore need not repeat its analysis to the extent that it has already addressed these particular claims of pretext. In addition, while Plaintiff cites the close proximity in time between his return from FMLA leave (on August 9, 2010) and his discharge (on September 2, 2010), he acknowledges that "temporal proximity cannot be the sole basis for finding pretext," but instead may serve as a "strong indicator of pretext when accompanied by some other, independent evidence." *Seeger,* 681 F.3d at 285 (internal quotation marks and citations omitted).

In an effort to identify such independent evidence of pretext beyond mere temporal proximity, Plaintiff first cites the purported "inconsistencies" in Defendant's initial and subsequent statements of the reasons for his discharge. The Court addressed this contention earlier, however, explaining that Ms. Camarota's brief statement to Plaintiff on the day of his discharge is consistent with, and does not contradict, Defendant's more thorough explication in this litigation of the grounds for terminating Plaintiff's employment.

Plaintiff next suggests that the record could support the conclusion that Ms.

38

Camarota viewed his FMLA leave as "an act of defiance," (Plaintiff's Response Br. at 20), where Plaintiff took this leave immediately after the July 22, 2010 meeting at which Ms. Camarota placed him on a Corrective Action Plan, and where Ms. Camarota testified that she was forced to work especially long hours while Plaintiff was on leave in order to cover his job responsibilities as well as her own.  Yet, while Ms. Camarota acknowledged that this need to handle Plaintiff's duties "[a]bsolutely" impacted her personal time during this two-week period, she further testified that she was not upset by this development, but instead viewed it as part of her "commitment to the company" to do "what it's going to take to get the job done."  (Camarota 6/19/2012 Dep. at 106-07.)  In addition, Defendant aptly observes that Plaintiff's theory on this point is "counterintuitive," (Defendant's Reply Br. at 4), given that the result of Plaintiff's discharge was that Ms. Camarota had to *continue* performing Plaintiff's job duties in addition to her own for several more month until the restructuring of Defendant's Customer Service department was completed in early 2011.  Thus, as Defendant points out, this claim of pretext is not only wholly speculative, but also "boils down to the position that [Ms.] Camarota hated performing Plaintiff's job, so she fired him to continue being forced to perform his job."  (*Id.* at 5 (emphasis in original).)

Finally, Plaintiff contends that a trier of fact could reasonably infer a causal nexus between his FMLA leave and Defendant's failure to provide him a "fair opportunity" to comply with his Corrective Action Plan upon his return from this leave.  (Plaintiff's Response Br. at 20.)  As discussed earlier, however, Defendant has identified legitimate,

39

non-discriminatory and non-retaliatory reasons for deciding to discharge Plaintiff after

only a short time on this plan — most notably, Plaintiff's statement that he disagreed with

the assessment of his job performance upon which the plan was predicated, and his failure

to comply with certain terms of the plan, such as its call for weekly meetings with Ms.

Camarota.  Against this backdrop, no inference of retaliatory motive arises from the fact

that Plaintiff was given only a limited opportunity to comply with his Corrective Action

Plan while other employees might have remained on their plans for longer periods,

particularly where Plaintiff has failed to identify any similarly-situated employee who

might have been treated differently in this regard.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's July 30, 2012

motion for summary judgment (docket #23) is GRANTED.

<u>s/Gerald E. Rosen</u>
Chief Judge, United States District Court

40

Dated:  July 2, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 2, 2013, by electronic and/or ordinary mail.

                s/Julie Owens
                Case Manager, (313) 234-5135